**CHISWICK PRODUCTS, LTD., G. C. Rut-terman & Co., Resina, A.G., "Oveg" chem. tech. Fabrik Leuck Y Kummel and Whitney & Oettler, Libellants,**

**v.**

**The SS STOLT AVANCE, her engines, tackle, apparel, furniture, etc. and Ko-mandittselskapet Avance, her owner, and Avance A/S Jacob Stoltneilsen, her manager, Respondents, Turpentine & Rosin Factors of Texas, Inc., and E. W. Saybolt & Co., Inc., Impleaded Respondents.**

**No. 63–B–34.**

United States District Court
S. D. Texas,
Brownsville Division.

Feb. 24, 1966.

Blades, Crain, Slator, Winters & Ross, James E. Ross and John F. Ensle, Houston, Tex., for libellants, for Turpentine & Rosin Factors of Texas, Inc., impleaded respondent, and for Home Ins. Co. of New York.

Baker, Botts, Shepherd & Coates, Frank G. Harmon and William C. Bullard, Houston, Tex., for respondents.

Hardy, Galindo & Sharpe, Fred Galindo, Brownsville, Tex., and William J. Walker, New York City, for E. W. Saybolt & Co., Inc., impleaded respondent.

## MEMORANDUM

GARZA, District Judge.

Purchasers of Mexican turpentine in Europe brought this libel for damages to cargo upon its arrival at destination.

In the summer of 1961, Whitney & Oettler of Savannah, Georgia, as brokers, agreed with Turpentine & Rosin Factors of Texas, Inc., to buy approximately 265 long tons of Mexican turpentine for ship-

ment to Europe for resale. Turpentine & Rosin Factors of Texas, Inc., obtained execution of a partial voyage charter for the carriage of the turpentine from the port of Brownsville, Texas, to designated ports in Northern Europe. The charter, in turn, was handled by a New York broker and provided for the tender of a seaworthy vessel to the charterers at Brownsville, Texas, in September, 1961, for loading and carriage of the turpentine to Europe. The vessel involved and which carried the cargo was the SS STOLT AVANCE, a Norwegian ship, and the libel was brought against it in rem and against its owners in personam.

Because of certain provisions of the charter,[1] the Respondent impleaded the charterer, Turpentine & Rosin Factors of Texas, Inc. The charterer had made arrangements with E. W. Saybolt & Co., Inc., to inspect the tank in which the turpentine was to be carried, before loading of the same, and Turpentine & Rosin Factors of Texas, Inc., impleaded Saybolt as respondent. The Respondent vessel then filed a third-party libel against E. W. Saybolt & Co., Inc.

Before the trial of this case, a motion was made by the original Respondent to substitute parties, alleging that The

Home Insurance Company (who had insured the cargo and had paid damages to the original Libellants) was the real party at interest and should be substituted for the Libellants. Since the Court was informed that the original Libellants might have damages over and above what The Home Insurance Company had paid them, the motion to substitute parties was granted in part, and The Home Insurance Company of New York was added as a libellant, and it adopted the allegations of the libel on file, and claimed against the Respondents as a subrogee under a certain policy of insurance which it had issued covering the cargo in question against damage or loss.

The question of damages was severed and the Court proceeded to trial on the issue of liability only.

It was stipulated that there was some damage or contamination by rust to the turpentine cargo when it arrived in Europe. The turpentine was discolored and rust particles in suspension were present. The rust or iron oxide particles in the turpentine at out turn, it was shown by the evidence, could be removed by filtration or distillation, and such removal would restore the cargo to its original form.

---

1. "a. WARRANTY. (a) The Owner (respondent vessel owner) shall, before and at the commencement of the voyage, exercise due diligence to make the vessel seaworthy, properly manned, equipped, and supplied for and during the voyage, and to make the pipes, pumps, and heater coils tight, staunch and strong in every respect fit for the voyage, and to make the tanks, holds, and other spaces in which cargo is carried fit and safe for its carriage and preservation.

"(b) It is understood that if the tank or tanks, into which the particular cargo covered by this Charter is to be placed, upon testing prove to be defective the Owner undertakes to execute the necessary repairs, provided repairs can be effected within 24 hours and at reasonable expense; otherwise, Owner has the option of cancelling this Charter in which case no responsibility shall rest with the Vessel, Owners, or agents.

\* \* \* \* \*

"15. CLEANING. Prior to loading, Charterer shall inspect te designated

tanks for the purpose of determining that they are in suitable condition for the loading and carriage of the cargo specified hereunder. Acceptance of the tanks by Charter's representative shall be conclusive as to their suitability for such purposes. If Charterer's representative does not accept the tanks as suitable for the cargo, the Owner shall have the right, at its option, to cancel this Charter Party, without any resulting liability on the part of either party, or to again clean the tanks, subject to inspection as above.

\* \* \* \* \*

"17. GENERAL EXCEPTIONS CLAUSE. \* \* \*

"(b) The tanks having been inspected by the Charterer's inspector as to tightness and cleanliness, notwithstanding any other provision of this Charter, neither the vessel nor the Owner shall be liable for loss or damage due to contamination, deterioration, discoloration or change in quality or characteristics, or leakages, unless there is negligence on the part of the vessel."

This cause of action is covered by the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., which will sometimes hereinafter be referred to as the Act or Cogsa.

When the turpentine was loaded in Brownsville, two bills of lading were issued and signed on authority of the master of the SS STOLT AVANCE, covering the shipment in question, and no exception was taken to the good order and condition of the cargo.

At the beginning of the trial, it was agreed amongst the parties that if any recovery was had in this case, that recovery belonged to The Home Insurance Company which by order of the Court had been made a libellant. It was further stipulated that if the Libellants recovered from the SS STOLT AVANCE, and the SS STOLT AVANCE, in turn, was awarded indemnity over and against Turpentine & Rosin Factors of Texas, Inc., but was not awarded indemnity against E. W. Saybolt & Co., Inc., then judgment could be entered that the Libellants take nothing. Turpentine & Rosin Factors of Texas, Inc., also dismissed its cross-action against E. W. Saybolt & Co., Inc.

The Libellants made a prima facie case by putting into evidence the two bills of lading showing no exceptions, and by reading into the record the stipulation that when the turpentine cargo was discharged from the SS STOLT AVANCE in England and Holland, it was off color and was damaged to some extent by particles of rust in suspension.

Respondent vessel then proceeded to put on its evidence. The evidence showed that the SS STOLT AVANCE, a tank ship of 5126 net tons, was built in England in 1949, and was purchased by the present owners in 1959. It was engaged in a regular run from the United States to Europe, laden with liquid cargo, and alternately would return from Europe to the United States empty.

Under Norwegian law, the SS STOLT AVANCE had to undergo an annual inspection for fitness and seaworthiness, and at all times material hereto she underwent such annual inspection.

On her Voyage No. 18, eastbound to Europe, she carried a cargo of toluene, a solvent, in her No. 8 center tank, and the same was discharged in Europe without compaint of damage or contamination. The cargo in the No. 8 center tank, which is the one involved in this case, prior to the toluene cargo on Voyage No. 18, was perch ethylene, and her cargo prior to the perch ethylene, was benzene.

The evidence showed that after the discharge of her toluene cargo in Europe at the conclusion of Voyage No. 18, her No. 8 center tank was Butterworth cleaned, dried with rags and made fit for the receipt of another cargo. On the vessel's Voyage No. 19 from Europe to the United States, her No. 8 center tank was empty and dry and carried neither ballast nor cargo.

The vessel's Voyage No. 20 to carry liquid cargo from the United States to Europe commenced on or about August 26, 1961, at Good Hope, Louisiana, after which she called at various Texas ports to receive cargo. Her last port of call in the United States before crossing eastward to Europe on her Voyage No. 20, was at Brownsville, Texas, on September 4 and 5, 1961. The vessel called at Brownsville to load the cargo of Mexican gum spirits of turpentine for carriage to London and Rotterdam in the No. 8 center tank. Prior to the vessel's arrival in Brownsville, her officers inspected the No. 8 center tank of the vessel and found it to be fit, clean, dry, substantially rust free, and suitable for carrying the turpentine carge to Europe.

Under the terms of the charter, the shipper or charterer of the ship, Turpentine & Rosin Factors of Texas, Inc., had made arrangements with E. W. Saybolt & Co., Inc., to inspect the No. 8 center tank for suitability for carrying turpentine cargo and to gauge the amount of turpentine cargo loaded in said tank.

A. K. Barnard, Jr., was the inspector of E. W. Saybolt & Co., Inc., who was assigned to inspect the No. 8 center tank.

Mr. Barnard testified that he boarded the vessel and he noted that the vessel had docked at 21:25. However, he testified that this hour he got was from the ship's log, and that since the ship was pretty well loaded by the time it got to Brownsville, it was pretty low in the water, and that he is sure that he boarded the same before the ship was securely docked and the last line put out. He stated that the ship started taking the cargo of turpentine at 21:40, but that this was when the pumps on the shore tank began to work. His explanation of having boarded the ship before it was securely docked was because of the contention of the Libellants that he could not have made a good inspection if he started the same at 21:25 and the ship began to load its cargo at 21:40, or even at 21:50 as shown by the ship's log.

I find that Mr. Barnard spent more than the time shown on his inspection report or the ship's log, in inspecting the center tank No. 8.

He testified that when he went on board the vessel, he determined the nature of the prior cargo and method of cleaning the tank. He then proceeded to make his inspection of the tank, probably in the company of the mate. In determining the method used by the vessel to make the No. 8 center tank suitable for the carrying of the turpentine, he noted in his report that the crew of the ship had cleaned center tank No. 8 with "hot fresh water, brushed down and wiped down with rags."

He proceeded to make a visual inspection of the entire surface of the tank's interior, and at no time was he more than fifteen feet from the surface of the tank. He testified that such visual examination was the only examination which he knew of that could be made or which was requested; that he wiped the walls of the tank with a rag and examined the bottom of the tank to see if there was any water or other liquid material or loose rust in the bottom of the tank.

After finishing his visual inspection, Mr. Barnard reported that center tank No. 8 was clean, dry, free of excessive rust scale and residue of previous cargoes, and that in his opinion from visual inspection only, said tank was in acceptable condition to load the cargo of turpentine. He so reported to those in charge of the SS STOLT AVANCE, to Turpentine & Rosin Factors of Texas, Inc., and to his employer.

The evidence shows that E. W. Saybolt & Co., Inc., had previously made the same type of inspections for Turpentine & Rosin Factors of Texas, Inc., and that this was the only type of inspection that had been done in the past or that could be done.

Under the charter, if Mr. Bernard had not found the center No. 8 tank fit for the carrying of the turpentine, the ship could have been asked to make the same fit, and Turpentine & Rosin Factors of Texas, Inc., could have declined to ship the turpentine on the SS STOLT AVANCE.

When the loading of the turpentine started, Mr. Barnard took one or more samples of the cargo from the shore tank owned and operated by the charterer. After the commencement of the loading, and at a time when about eighteen inches of turpentine had been loaded in the bottom of the No. 8 center tank, he took another sample of the cargo. It took about seventeen hours to load the cargo, and Barnard took a sample from the ship's tank about every hour during the period of loading. At the conclusion of the loading of the turpentine cargo, Mr. Barnard took an average sample from the ship's tank. All the samples taken both from the shore tank and the ship's tank were found to be clear or "water white".

At the conclusion of the loading, Mr. Barnard determined that the charterer had loaded about 3000 gallons of water into the No. 8 center tank of the vessel, but no effort was made to remove the water from the bottom of the tank.

E. W. Saybolt & Co., Inc., retained the samples for approximately six months, except that pursuant to request from

Whitney & Oettler following the report of alleged contamination of the cargo upon arrival in Europe, portions of the samples were sent by it to Whitney & Oettler in Savannah, Georgia.

At the conclusion of the loading, the No. 8 center tank was properly closed and then the tank was sealed by E. W. Saybolt & Co., Inc. The SS STOLT AVANCE sailed from Brownsville for La Havre on September 5, 1961, on her Voyage No. 20.

On September 8, 1961, the SS STOLT AVANCE encountered Hurricane Carla in the Gulf of Mexico, and remained in the hurricane until September 11, 1961, during which time she underwent extremely heavy pitching and rolling and significant damage.

The deck log of the vessel showed that the vessel entered the hurricane on September 8, and sustained extremely heavy weather and high wind, with heavy pitching and rolling, until September 11, 1961. During the night of September 10, an air vent leading to the engine room was blown away. Part of the hand rail on the aft deck was broken off. The cover over the steam pipe on the poop was broken, as well as the pipe to the winch on the aft deck. The stern lights were torn away by the sea, and several of the seals on the valves on the deck were broken and destroyed.

Hurricane Carla was a fortuitous action of the elements of the sea and was of such force to overcome the strength of a well-found ship and the usual precautions of good seamanship, and thus was a peril of the sea.

I find that prior to the loading of the turpentine cargo and commencement of the voyage, the owners of the SS STOLT AVANCE used due diligence to make the vessel seaworthy, to properly man, equip and supply the ship, and to make the No. 8 center tank and all other pertinent parts of the ship fit and safe for the reception, carriage and preservation of the turpentine cargo.

Any and all damage or contamination to the turpentine cargo in question claimed by Libellants herein was solely and proximately caused by the effect of Hurricane Carla upon the vessel and her cargo, and such hurricane was a peril of the sea.

Vessels such as the SS STOLT AVANCE, which carry liquids in bulk, use the Butterworth method for cleaning the tanks after discharge of a cargo, and there is no question that this is what was done to prepare center tank No. 8 for the reception of the turpentine.

From testimony, I find that almost all tanks, such as center tank No. 8, have some amount of oxidation or fine rust on them. However, this oxidation or fine rust will cling to the sides of the tank and not go into suspension in the cargo being carried in an ordinary voyage. If center tank No. 8 had had excessive rust scale, the agitation during the loading would have been sufficient to have made such excessive rust scale go into suspension in the cargo, and the samples taken by the representative of E. W. Saybolt & Co., Inc., would not have been clear and "water white".

The Libellants, in cross-examination of the witness Stewart of the Respondent vessel, and of Barnard, brought out the fact that sometimes tanks can be cleaned by a chemical method, but it was shown that the toluene cargo which had been carried previously was a chemical as good as any that could be used in a chemical cleaning of the tank. Sand blasting of the tanks is another method that can be used in cleaning tanks, but this is rather expensive and is only done once in the lifetime of a vessel.

The heavy seas caused by Hurricane Carla and the pitching and rolling of the storm for five days with the turpentine undoubtedly being extremely agitated, caused the walls of the tank to flex and the fine coating of iron oxide normally found on the tank walls to scale off and come into suspension with the turpentine. There is no question that the hurricane was the cause of the iron rust particles to come into suspension with the turpentine cargo.

Since at the beginning of the voyage, center tank No. 8 was fit for the carrying of the turpentine, the Libellants under the Act cannot recover.

They argue that the master of the vessel was negligent in heading into Hurricane Carla, although the mate testified that as far as he knew no one on the vessel knew that they were going to run into Carla. Even if I were to find that the master of the vessel was negligent in leaving Port Brownsville when he did, which I cannot do under the facts before me, this would be of no avail to the Libellants, for, as stated in Gilmore and Black in The Law of Admiralty, at page 140:

"Where the 'skill and diligence' which might have overcome an alleged sea peril concern the navigation and management of the ship, it could make no difference in result, under Cogsa, whether the loss was caused by the sea peril or by negligence in navigation and management, for the carrier has a good exception under either head."

The vessel owner having proven that he used due diligence to make the vessel seaworthy prior to the voyage and the loading of the cargo, the Libellants are not entitled to recover against the vessel or her owners on their libel; and, therefore, judgment must be rendered for the Respondent vessel.

This finding removes the necessity of determining the questions of indemnity which were raised by the impleading of Turpentine & Rosin Factors of Texas, Inc., and E. W. Saybolt & Co., Inc.

This Memorandum contains the Findings of Fact and Conclusions of Law of the Court.