**COASTAL STATES PETROCHEMICAL CO.**

v.

**MONTPELIER TANKER COMPANY, in personam, and the SS MONTPELIER VICTORY, her engines, tackle, etc., in rem.**

No. 65–C–19.

United States District Court,
S. D. Texas,
Corpus Christi Division.

Jan. 22, 1970.

William Carl Bullard and Frank E. Caton, Baker, Botts, Shepherd & Coates, Houston, Tex., for plaintiff.

George Williams Renaudin, Royston, Rayzor & Cook, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SEALS, District Judge.

The plaintiff brought this suit in admiralty to recover damages for the contamination and discoloration of a cargo of gasoline owned by the plaintiff and shipped on board the defendant's vessel, the S.S. MONTPELIER VICTORY, from plaintiff's refinery in Corpus Christi, Texas to California.

Plaintiff and defendant entered into a "Tanker Voyage Charter Party" in May of 1964 in which plaintiff chartered the aforesaid vessel for the purpose of transporting plaintiff's petroleum products to California from Corpus Christi and from California to the New York area. The parties contemplated the carriage in trilateral fashion of gasoline or other "clean" petroleum products from the plaintiff's Corpus Christi refinery to California Ports, and after unloading the "clean" products in California the vessel would take on a load of "black" oil, such as crude petroleum or residual fuel, for carriage to the New York area.

Plaintiff asserts that on the occasion in question the contamination and discoloration of the "clean" cargo was caused by the unseaworthiness of the vessel and the negligence of her owner. Plaintiff alleges that prior to the execution of the Charter Party between plaintiff and defendant, defendant removed certain valves from the crossover lines on the vessel because the valves were defective and leaking, and in place thereof defendant put blind flanges. Although the defective valves were repaired and returned to the vessel, plaintiff asserts that they were not replaced on the crossover valves in their intended place and for their intended purpose. Plaintiff contends that the continued use of blind flanges in the crossover valves without allowing for full circulation of cleaning agents caused residuals from prior "dirty" cargoes to remain in the spur lines formed by the blind flanges which could not be removed with the customary cleaning process and which caused contamination and discoloration to subsequent gasoline cargoes.

Plaintiff also alleges that defendant was negligent in failing to return the properly functioning valves to the crossover lines prior to the delivery of the ship under the Charter Party in question, defendant having had full knowledge that the ship was originally built and equipped with such valves and that their function was to permit free circulation in the loading lines. Plaintiff asserts that defendant knew or should have known in the exercise of ordinary care that complete cleaning of the loading lines could not be accomplished as long as valves were not in the crossover lines which could be opened during cleaning.

Plaintiff further asserts that defendant breached the warranty of seaworthiness clause of the Charter Party in failing to provide a seaworthy vessel and in failing to use due diligence to make the

vessel seaworthy prior to the commencement of the Charter Party and prior to the voyage in question. The plaintiff argues that the General Exceptions Clause, a typed addendum to the Charter Party which provides that "(o)wners shall not be responsible for contamination or discoloration of cargo resulting from previous cargoes carried", cannot as a matter of law excuse the defendant from its warranty in these regards.

Defendant denies damage to the cargo occurred, or alternatively that if discoloration or contamination occurred, it was a trade risk assumed by the plaintiff under the circumstances of and inherent in this carriage; and that in any event the defendant is not liable to the plaintiff for any contamination and/or discoloration of the gasoline cargo by reason of the fact that if such occurred it was due to the fault of the plaintiff or its sub-contractors and not to the fault of the defendant or any unseaworthiness of the ship. Defendant further submits defendant is not liable in any event under the provisions of the charter party under which the cargo was carried.

Defendant argues that the plaintiff and its appointees were solely responsible for cleaning, inspecting and passing upon the fitness for carriage of the ship's tanks, pumps and lines on the voyage involved.

Defendant further urges that the printed clause 18 of the Charter Party expressly exonerates defendant for any discoloration or contamination of the cargo. Defendant asserts that the carriage made the basis of the Complaint is governed exclusively by the Charter Party, is one of private carriage and is in no respect common carriage, and that the MONTPELIER VICTORY was not under the liabilities and obligations of the U.S. Carriage of Goods by Sea Act. Defendant has also taken the position that acceptance of the vessel by the charterer precludes this action for damages arising out of cleaning of tanks and lines as further parts of the Special Provisions of the Charter Party.

The case having been tried before the court, the court now enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On May 25, 1964, Coastal States Petrochemical Company and Montpelier Tanker Company entered into a "Tanker Voyage Charter Party" for the carriage of petroleum products on several successive voyages on board the SS MONTPELIER VICTORY, a tanker vessel owned by Montpelier Tanker Company.

2. The parties contemplated the carriage in trilateral fashion of gasoline or other "clean" petroleum products from the plaintiff's Corpus Christi refinery to California ports and after unloading of the clean products in California, the vessel would take on a load of "black" oil, such as crude petroleum or residual fuel, for carriage to the New York area.

3. Upon discharge of the black oil in the New York area, a cleaning crew from Marine Maintenance Company would board the vessel and ride her in ballast to the Gulf Coast, performing the function of cleaning the tanks for the receipt of another cargo of clean products destined for the West Coast.

4. The Charter Party provided that the vessel would be in all respects clean for the receipt of cargo at Corpus Christi at the commencement of the charter.

5. On June 1, 1964, the SS MONTPELIER VICTORY loaded her first cargo of gasoline at Corpus Christi and commenced her first voyage under the subject Charter Party. She continued her voyages under the Charter Party as anticipated, and on September 9, 1964, she departed from New York for Corpus Christi in ballast, having discharged a cargo of crude oil in New York and having taken on the Marine Maintenance Company cleaning crew.

6. On this ballast voyage, the vessel and the cleaning crew undertook to clean its tanks and pipeline system in order to receive a full cargo of gasoline at Corpus Christi.

7. On September 16, 1964, the vessel arrived at plaintiff's refinery at Corpus Christi and loaded 341,003.56 barrels of gasoline destined for shipment to California. It was during this loading that the contamination and discoloration is alleged to have occurred.

8. Prior to the delivery of the SS MONTPELIER VICTORY under the Charter Party dated May 25, 1964, the defendant vessel owner had experienced certain difficulties with valves in the vessel's pipeline system.

9. The pipeline system had loading lines running fore and aft on the vessel and was equipped with crossover lines between these loading lines.

10. Prior to this Charter Party, difficulty was experienced by the vessel owner with the valves on the crossover lines. These valves were leaking under pressure and were removed for repair.

11. In the place of the valves, defendant equipped crossover lines with blind flanges which were effective in preventing contamination of one cargo by another. After the valves were removed and repaired, they were returned to the vessel, but they were not returned to the crossover lines. They were stowed under deck, and defendant allowed the blind flanges to remain in the crossover lines.

12. If any discoloration or contamination of the gasoline took place, it was proximately caused by the failure of the plaintiff adequately to clean the ship's tanks, rather than as a result of a residue of prior black oil cargo having accumulated in the spurs of the crossover lines created by the blind flanges. I have reached this conclusion for a number of reasons some of which are outlined below as follows:

(a) The carriage of a clean product, such as gasoline, on a tanker which had been engaged in the carriage of black oil will inevitably cause some discoloration of the gasoline by absorption into the gasoline of a residue of the black oil adhering to the tanks, their frames, angles, spaces, hard-to-get to areas, internals, etc. This is true even if there has been an intermediate upgrading of black oil cargoes before the loading of gasoline, such as light crude or heating oils. However, carriage of gasoline immediately following black oil cargoes without an intermediate upgrading is an "unorthodox and unusual" practice which can only serve to heighten the inevitable discoloration to be anticipated in the clean product.

(b) The gasoline loaded on the MONTPELIER VICTORY on September 15 and 16, 1964 was placed aboard after a maximum cleaning of only seven days following discharge of a crude oil cargo, carried from Mobile to New York and a residual fuel oil cargo carried from El Segundo, California to New York.

(c) It is common practice to engage the services of an expert licensed petroleum inspector, such as Martin or Saybolt, to pass upon the fitness of a tanker to receive a clean cargo such as gasoline. The defendant followed this practice when trading for its own account. On the first gasoline charter the plaintiff used the services of such an expert, Charles Martin & Co., who issued its certificate dated June 1, 1964 (plaintiff's Exhibit 3), but on subsequent gasoline voyages the plaintiff failed to use the services of such an expert, and instead relied on the judgment of its marketing Vice-President, Mr. E. J. Fourticq, and the cleaning contractor's Supervisor, Mr. Walter Addison.

(d) Sufficient cleaning of a tanker of this size after the dirty oil trade in which plaintiff had used it is a time consuming and expensive operation. The plaintiff was aware of the nature of the expense involved and was matching the minimizing of such expense against the known loss of color to be expected, and thereby taking a calculated risk on the extent of discoloration—apparently an unknown.

(e) The plaintiff's evidence was that the worst discoloration was in the gasoline loaded in tanks 1 and 2 across (the

forwardmost tanks). The evidence shows that these are the hardest tanks to clean. They are the furthest away from the butterworth heaters in the pumproom and due to the shape of the ship at the bow present unusual problems in cleaning the many structural supports in that area of the vessel.

Due to the use by the defendant of the drop line method of loading tanks 1 and 2 across, the gasoline cargo loaded in these six forward tanks would not pass or become subjected to any blanked off spur lines which plaintiff contended contained a residue of prior black oil cargo. On the contrary, the gasoline, as it was loaded, came from the header at the ship's manifold along the drop lines elevated above the ship's weather deck, and then was dropped directly down into the No. 2 center tank where the drop line filled the forward tanks 1 and 2. The loading of these tanks therefore bypassed the blanked off spur located in No. 3 center tank. Accordingly, if the spur lines were the cause of the contamination as plaintiff contends, it was physically impossible in the area of the very worst discoloration for the spur lines to have had any effect whatever on discoloration. The only possibility of the gasoline passing the blank in the No. 3 tank would be a human error on the part of the vessel in failure to close the block valve in the bottom of No. 2 tank which valve is manually closed by turning on the main deck. However, the only evidence on this point came from the ship's Chief Officer who testified that he personally closed this valve on the deck and tied it off. Had this valve been open, cargo passing it would not have entered tanks 1 and 2. The plaintiff was under the misconception that the cargo had been loaded through the ship's pumproom. When its model was demonstrated it assumed such loading method. However, it had no direct evidence to this effect and merely presented the evidence of a Humble Oil tanker Captain (Hoesch) who in his experience, which was limited to Humble, did not believe it was unusual to load through the pumproom. However, admittedly, he normally carried 20 grades of cargo at a time on Humble tankers requiring that he go through the pumproom. But defendant Victory Carriers, through Captain Preusch's testimony, showed that it would not be the practice for loading through the pumproom in the carriage of only two grades of gasoline and that this would certainly not be the practice of Victory Carriers. Accordingly, not only was it Victory Carriers' company policy not to load through the pumproom but this appears to the Court to be a much more complicated, clumsy and indirect method of loading where it is not necessary to use the pumproom. Additionally, the only affirmative evidence presented on whether it was drop line or pumproom loaded came from the defendant, whose Captains Rippchen and Sulcs affirmatively testified that the cargo was loaded in tanks 1 and 2 across through the drop line. Therefore the very worst discoloration of which the plaintiff complained could not have come from the blanked spur lines and necessarily took place, if at all, because of an inadequate cleaning of the forward tanks.

(f) There is 900,000 square feet of tank surface area which had to be cleaned, including difficult to reach areas such as frames, internals, etc., as opposed to only 368 square feet of surface in the spur lines which could possibly have been affected by being blanked off at one end. The sheer weight of the ratio points strongly toward tanks rather than spur lines as being the cause of the alleged contamination.

(g) Although Mr. Fourticq, plaintiff's Marketing Vice-President, testified that after he required the valves to be reinstalled and the blanks removed from center tanks 3, 6 and 9 no further discoloration was encountered on subsequent cargoes carried, it was affirmatively proven that Mr. Fourticq was mistaken. On the voyage immediately following the replacement of the valves at Corpus Christi on or about October 26, 1964, a discoloration of kerosene took place when the

MONTPELIER VICTORY carried gasoline and kerosene from Corpus Christi to California, sailing from Corpus Christi on October 30, 1964, on Voyage 9/45. Mr. Fourticq had been under the impression that this kerosene had been carried on Voyage 4/40.

(h) The MONTICELLO VICTORY, a sister ship of the MONTPELIER VICTORY, was chartered by the plaintiff on September 11, 1964, for carriage of gasoline from Corpus Christi to the west coast on one trip. The MONTICELLO VICTORY had also been in the black oil trade, and when tendered to the plaintiff at Mobile it had valves removed and blanks installed in the identical tanks and cargo lines. The plaintiff cleaned that vessel enroute from Mobile to Corpus Christi and further at Corpus Christi, all with the blanks in place. The MONTICELLO VICTORY'S gasoline was not discolored on arrival in California.

(i) While the plaintiff's witnesses Mr. Fourticq and Mr. Addison initially testified that it was on the MONTICELLO VICTORY at Corpus Christi where they had a blank removed and saw a residue of prior black oil cargo in one of the spurs, this testimony was changed on redirect presentation of the plaintiff's evidence when Mr. Addison took the stand and said it must have been the MONTPELIER VICTORY. If so, this could only have occurred in late October, 1964, when the valves of the MONTPELIER VICTORY were replaced at Corpus Christi. However, at the time Mr. Addison saw such residue in one of the spurs of the MONTPELIER VICTORY it was prior to a completion of the cleaning of the lines of that ship, which cleaning was done with diesel oil rather than hot salt water only, as had been used by the plaintiff on its two prior gasoline voyages.

(j) The plaintiff never produced any actual evidence of an accumulated residue of prior black oil cargoes in the spur line on the September, 1964, gasoline voyage. Mr. Addison, when he took the stand a second time, said it was a spur line of the MONTPELIER VICTORY, in which he had seen the accumulated residue and it was shown that actual cleaning of the lines had not taken place at the time Mr. Addison saw any accumulated prior cargoes in a spur. (Reference to the MONTPELIER VICTORY'S stay in Corpus Christi between October 25, and 30, 1964).

(k) The plaintiff's witness, Mr. Addison, said that the residue he saw upon removal of a blank was about one and one-half inches adhering to the inside diameter of these 14 inch spur lines. The defendant took a 1½ inch residue of prior black oil such as the MONTPELIER VICTORY had been carrying and assumed that all such 1½ inch residue had dissolved into the gasoline cargo. This amounted to 8¼ barrels of oil in 342,000 barrels of gasoline. By test it inserted such entire residue into a sample of the 100 octane gasoline supplied by the Plaintiff on the ratio of 8¼ barrels of oil into 342,000 barrels of gasoline.

It also assumed that instead of just 1½ inches as a residue, the lines were either half full (9½ barrels) or completely full (19 barrels) of such residue. Defendant contaminated the gasoline to these ratios to the gasoline carried, 342,000 barrels. None of the tests reflected that either 1½ inches, half full or entirely full of prior black oil cargoes, would cause the gasoline to become discernably discolored or lose its reddish color.

(1) The MONTICELLO VICTORY, in addition to blanks in the cargo lines in center tanks 3, 6 and 9, contained over 20 additional blanked off spurs at the time it received gasoline in Corpus Christi in September, 1964, and yet no discoloration of the gasoline was experienced during the carriage of gasoline on the MONTICELLO VICTORY, which itself had been employed in the black oil trade immediately prior to loading gasoline.

2. Plaintiff has not shown by a preponderance of the evidence that the gasoline was discolored sufficiently to be damaged.

3. By electing to engage in this unusual and unorthodox carriage of gasoline directly behind the carriage of dirty cargoes without an intermediate upgrading of black cargoes before loading gasoline, the plaintiff took a calculated risk that the discoloration would not be so great as to render the gasoline either damaged or unmarketable. The plaintiff, fully aware of this risk, compounded it by a relatively short and comparatively inexpensive cleaning period.

4. Under the terms of the charter party contract the plaintiff was obliged to and undertook to clean the ship's tanks, pumps, and lines. To carry out its obligation to clean, the plaintiff placed aboard, in preparation for gasoline carriage, employees of Marine Maintenance Company, a cleaning contractor, with their supervisor. The defendant permitted the plaintiff's contractor to use its butterworth machines and the ship's crew under the contractor's direction and supervision to butterworth the tanks. But the plaintiff paid for all the butterworthing by the crew which was done on an overtime basis. Mr. Addison, the supervisor of plaintiff's contractor, told the ship's personnel when he wished the vessel's lines to be flushed and when the flushing should stop. On the July "conversion" and on the "conversion" prior to the September loading when the alleged discoloration took place, the ship's lines were merely flushed with hot water. However, on the voyage subsequent to the "discoloration" voyage in September, when gasoline was to be loaded aboard again following intermediate dirty oil carriages, the plaintiff cleaned the ship's lines with diesel oil both in Philadelphia (Delaware City) and upon arrival in Corpus Christi.

5. The presence of blanks in the way of three crossover valves of the SS MONTPELIER VICTORY did not constitute a condition of unseaworthiness.

While it may be, although there is no preponderance of the evidence on the point, that the presence of the blanks rendered the cleaning of the lines more difficult, I do not and cannot find that their presence constituted unseaworthiness. There was substantial evidence presented by the defendant that the cleaning of the lines could be accomplished and had previously been accomplished with the blanks in place; and further I find that the plaintiff and its cleaning contractor were well aware of the presence of the blanks and could have arranged for their removal if this were indicated to facilitate cleaning. I further find that the plaintiff, having assumed the obligation of cleaning the tanks and lines and having undertaken to be responsible for the supervision and inspection of the cleaning and passing of the vessel as fit to load gasoline, knew or should have known about any difficulty which the presence of the blanks may have caused as to cleaning and/or flushing of the cargo lines.

6. The plaintiff knew or should have known that the forward tanks of the MONTPELIER VICTORY were not sufficiently cleaned on September 15, 16, 1964 to receive a cargo of gasoline, a clean product, after having been told by the vessel's Chief Mate, Captain Sulcs, that in his opinion, when asked by Mr. Fourticq, the forward tanks were not sufficiently clean to load kerosene.

7. The plaintiff has not shown by a preponderance of the evidence that any act or omission of defendants constituted actionable negligence proximately resulting in the injuries complained of by plaintiff in this cause.

CONCLUSIONS OF LAW

1. The gasoline cargo allegedly damaged was carried under a contract between plaintiff and defendant known as a charter party. There were no bills of lading issued and a manifest served as a receipt. The plaintiff was the owner of the cargo at the time it was loaded and when it was discharged

from the ship. Accordingly, the carriage was entirely private and not common carriage. The charter party's terms did not incorporate any carriage legislation such as the Harter Act or U. S. Carriage of Goods by Sea Act, and the relationship of the parties, their duties and obligations, are therefore measured solely by the contract and not by any such legislation. In private charter parties the "risks of damage may be adjusted in any manner specified by the charter." The HEINZ HORN, 404 F.2d 422, 429 (5th Cir. 1968).

■ 2. Since this was private carriage the burden of proof was entirely upon the plaintiff to show by a preponderance of the evidence that the damage was proximately caused by a breach of the contract of carriage on the part of the defendant, not acquiesced in by the plaintiff. Commercial Molasses Corp. v. New York Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941). The breach of contract referred to must necessarily have been under the circumstances of the particular case an unseaworthiness of the ship in the form of an unfitness for carriage of the cargo, resulting from a condition or situation which the defendant was charged with remedying or carrying out under the terms of the charter party. Specifically in this case the only charge of such nature asserted by the plaintiff was the failure of the defendant to have crossover valves in place in center tanks 3, 6 and 9 in the cargo lines where the defendant had fitted blanks in the year before this charter party commenced.

Under the terms of the charter party the plaintiff undertook by virtue of the Cleaning Clause (Special Provision No. 4, a typewritten added addendum to the charter party) to clean the ship's tanks, lines and pumps at the plaintiff's risk and expense. Under the same provision of the charter, once the vessel was tendered clean and accepted by the plaintiff, the plaintiff thereafter not only did the cleaning but also did the inspecting and passing upon the fitness of the ship's tanks and lines for receipt of its clean cargoes. Plaintiff arranged its own cleaning of the vessel during its alternate voyages from dirty to clean cargo.

■ After a careful review of all of the evidence the court concludes that the plaintiff has not only failed to establish by a preponderance of the evidence that the presence of the blanks in the spur lines proximately caused a discoloration equalling an actual damage to the cargo of gasoline, but the defendant has affirmatively shown by a preponderance of the evidence that the most likely cause of any such discoloration was the inadequate cleaning of the ship's tanks in preparation for receipt of gasoline. The burden rested upon the plaintiff to persuade the court that the proximate cause of the loss was presence of the blanks and that such constituted unseaworthiness, as opposed to a far more likely cause of discoloration, an inadequate cleaning of the tanks caused from the prior black oil cargoes. At best the cause of the discoloration has been left in doubt.

The only evidence of any nature whatsoever that a discoloration had taken place or that any receiver had rejected the cargo was the oral testimony of plaintiff's Vice-President, Mr. Fourticq. Considering the inconsistencies in Mr. Fourticq's testimony in general on other points as recited in the Findings of Fact, this is insufficient to establish a discoloration to the point of damage of this cargo of gasoline. Clearly some discoloration was anticipated by the plaintiff. None of the usual and customary methods of testing and examining the cargo were employed by the plaintiff to show its actual order and condition at the time it left the shore tanks and arrived at ship side and in the ship's tanks at the loading port or in the ship's tanks at discharge ports. (See The GRENA, D.C., 292 F.Supp. 500, 1968 A.M.C. 1202; The STOLT AVANCE, 257 F.Supp. 91 (S.D.Tex. 1966), aff'd, 387 F.2d 645 (5th Cir. 1967); The NORSE COMMANDER, 264 F.Supp. 625 (S.D.Tex.1966).

■ 4. As stated in Conclusion 2, the plaintiff, by virtue of the contract's cleaning clause, was obliged to clean the ship's tanks, pumps and lines at its own risk and expense. Under the same provision of the charter party it was agreed that "(o)wners shall not be responsible for contamination or discoloration of cargo resulting from previous cargoes carried." In view of the unorthodox and unusual nature of the carriage, the defendant was unwilling to charter its vessel to the plaintiff on another basis. The plaintiff having undertaken the expense, responsibility and risk of cleaning, also agreed that the risk of loss from discoloration due to previous cargoes carried would be borne by it. I see no indication in law or in equity why the agreement of the parties should not be given effect. Defendant agreed, in a printed portion of the contract, to tender a seaworthy vessel. However, the Cleaning Clause, containing the exonerating provision quoted above, is incorporated by a typewritten added addendum which under the ordinary rules of contract construction, when in conflict, will prevail over any printed form to which the typewritten added addendum is attached. If the clauses are in conflict the typewritten one prevails over the printed one. Cooper v. Pinedo, 212 F.2d 137 (5th Cir. 1954).

■ There would seem to be no prohibition of a clause of this nature under the United States Supreme Court's decision in Bisso v. Inland Waterways Co., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. The Bisso case pertains to a towage contract attempting to relieve a tug boat owner from liability for its own negligence. As such, the Supreme Court pointed out in its opinion in Bisso that it was dealing only with towage as opposed to carriage and that it was prohibiting release of negligence clauses, which has nothing to do with a contention such as made by the plaintiff herein of a breach of contract relating to seaworthiness and where no negligence has been proven. In a per curiam opinion, the Supreme Court reaffirmed Bisso in Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), but in no way expanded the prohibition of exculpatory clauses beyond the Bisso rule against the contractual exemption of a towboat from responsibility for its negligence.

Recently, in A. L. Mechling Barge Lines, Inc. v. Derby Co., 399 F.2d 304, 305 (5th Cir. 1968), the Court of Appeals for the Fifth Circuit stated in a towage case that Bisso and Dixilyn "are relevant, if not necessarily controlling," in cases where the exculpatory clause concerns the scope of the warranty of seaworthiness, as well as those cases where the question is negligence. The court then stated:

"We recognize the difference between negligence and unseaworthiness and between a private carrier and a common carrier. But we are dealing here with the construction of an exculpatory clause. Even if Bisso and Dixilyn were distinguishable, we would feel compelled to say that, absent plainly unambiguous language, a general exculpatory clause cannot be construed to mean that it relieves a shipowner of the obligation of furnishing a seaworthy vessel."

Id. (latter emphasis added).

This court is of the opinion that the exculpatory clause (providing that the "owners shall not be responsible for contamination or discoloration of cargo resulting from previous cargoes carried") which was added to and made part of the charter party in the present case, is clear and unambiguous within the meaning of the Mechling decision. It was the obvious purpose of the parties to exculpate the owner of the SS MONTPELIER VICTORY from liability for damages of the type described, whether such contamination or discoloration were to flow from unseaworthiness or otherwise. Actually, this exculpatory clause falls far short of being general in the sense that defendant would be excused from its entire duty to provide a seaworthy

vessel. The vessel owner remained responsible for damage to the plaintiff's cargo proximately resulting from an unseaworthiness of the vessel as long as the damage complained of was not in the nature of cargo contamination or discoloration.

Because the present case does not revolve around a towage transaction, as did *Mechling*, as well as *Bisso* and *Dixilyn*, application of the decision of the Court of Appeals for the Fifth Circuit in *Mechling* to the present case would require judicial expansion of the rule against negligence exculpatory clauses similar to the expansive reading of *Bisso* or *Dixilyn* required to cause either of those Supreme Court decisions to be applicable here. Although neither forum has yet considered the question, this court feels confident that neither the Supreme Court nor the Court of Appeals for the Fifth Circuit will expand the prohibition against negligence exculpatory clauses in towage contracts to encompass exculpatory clauses in private carriage agreements where, in clear and unambiguous language, the warranty of seaworthiness is excluded or restricted, and where, as here, the respective bargaining position of the contracting parties is roughly equivalent, or, at least, not grossly disparate.

The over-all public policy to which the Supreme Court addressed itself in *Bisso* was to prevent in towage transactions the monopolistic release of negligence by contract where a harbor tower would be in a position to force any shipowner to use its services on its terms or to have no tug available in a particular harbor. This policy is certainly not present here as neither party was in such dominant position that it could dictate the terms of the contract. The plaintiff was a large shipper of petroleum products which had the entire U.S. Flag tanker fleet with which to negotiate the terms of its private arrangement, as opposed to a towing tariff of a harbor tug which a shipowner would have to accept or receive no towing service at a particular port.

Plaintiff decided to attempt to introduce its surplus gasoline into the California market, rather than face the shutting down of its refinery at Corpus Christi. In developing this new market, plaintiff needed the lowest possible freight rate between the Gulf of Mexico and California ports. When the plaintiff chartered the MONTPELIER VICTORY it insisted on the maximum amount of flexibility in scheduling the vessel's itinerary, and sought freedom in deciding the type of products to be carried and the sequence in which they were to be carried.

Defendant, in meeting the degree of flexibility which the plaintiff required and in offering a low basic freight rate which was acceptable to plaintiff, had to insist that this agreement contain a clause making the cleanliness of the vessel's tanks and lines the complete responsibility of the plaintiff. Since plaintiff was to determine the nature and specifications of cargo to be carried, as well as the sequence of alternate clean and dirty cargoes, defendant had no way of estimating what costs and time would be involved. Thus, it was unable to take these factors into account in fixing an overall freight rate if the responsibility for cleaning was to remain with the vessel. The freight rate, in order to cover all contingencies associated with cleaning, necessarily would have had to be high. As evidenced by the terms of the charter party agreement which the parties entered into, a low freight rate applied and the time for cleaning, together with the risk and expense thereof, was left to the plaintiff as charterer. In accordance with options contained in the charter, plaintiff could best decide the degree of cleanliness which it required and could arrange cargoes acceptable to and compatible with its own schedule.

The charter party provided for 72 running hours of laytime, the time allowed plaintiff for loading and discharging the vessel. Depending on the capability of the terminals nominated by plaintiff, it was expected that loading

and discharging would only entail some 36 to 48 hours. Plaintiff, however, was permitted to use any remaining laytime as a credit against extra time it used for the cleaning. Otherwise, it was intended that the plaintiff would pay for cleaning time at the rate of $275.00 per hour (the demurrage rate stipulated in the charter) for all time used beyond the vessel's normal ballasting time in proceeding from the eastern discharge ports to loading ports in the Gulf of Mexico. At the time involved, the vessel's actual operating costs per day, not including any profit factor, averaged $6,375.00. This was without taking into account port charges or unusual expenses incurred in port from time to time. This operating cost is compatible with the demurrage rate of $275.00 per hour which plaintiff was required to pay and which totals $6,600 per day. Thus, in a practical sense, defendant was not realizing a profit while the vessel lay at Corpus Christi during cleaning operations. On the other hand, when laytime expired it was costing plaintiff $6,600 per day for days when the vessel was not engaged in actually carrying cargo, her principal function. It was clearly a commercial decision to be made by plaintiff whether to detain the vessel for an additional time to allow further cleaning, or limit the cleaning period to a minimum and run the risk of encountering some loss of color in the product to be carried. Since only plaintiff knew the specifications that its gasoline cargo was expected to meet upon its arrival at U.S. West Coast ports, it was only plaintiff who could make this decision.

Accordingly, public policy against an agreement such as the one quoted herein should not enter into a decision made by the shipper to risk the degree of discoloration to be achieved under the unusual and unorthodox method of carriage employed and anticipated by his own agreement.

By reason of the foregoing, the Libel and Complaint against the defendant, MONTPELIER TANKER COMPANY and defendant SS MONTPELIER VIC-TORY, its engines, tackle, boilers, apparel, etc. should be dismissed with costs of the defendant taxed to plaintiff.

Counsel for defendant will submit an appropriate judgment approved by counsel for all parties as to form.